**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | Case No. 09 CR 0687 |
| v. | |
| **LESLIE C. MAYFIELD, NATHAN L. WARD and DWAYNE R. WHITE,** | Hon. Harry D. Leinenweber |
| Defendants. | |

### MEMORANDUM OPINION AND ORDER

The Defendants Leslie C. Mayfield ("Mayfield"), Nathan L. Ward ("Ward"), and Dwayne R. White ("White") each move for a Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, Defendants Mayfield and Ward move for a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons stated below, Defendants' Motions are denied.

### I. BACKGROUND

#### A. Procedure

Defendants Leslie Mayfield, Nathan Ward, and Dwayne White were arrested on August 10, 2009, along with Co-Defendant Montreece Kindle ("Kindle"). On September 9, 2009, a grand jury charged the four defendants with conspiracy to possess with intent to distribute five kilograms or more of cocaine (Count 1), attempted possession with intent to distribute five kilograms or more of

cocaine (Count 2), and possession of a firearm in furtherance of the conspiracy to possess with intent to distribute five or more kilograms of cocaine (Count 3). The grand jury also charged Mayfield, Ward, and White with possession of a firearm after having been convicted of a felony in Counts 4, 6, and 7 respectively.

Mayfield, Ward, and White were tried separately from Kindle. Their trial began on July 6, 2010 and lasted six days. On July 14, 2010, the jury returned a verdict of guilty for all three defendants on all counts (Counts 1-4 and 6-7). The Court granted an extension of time to August 23, 2010 for post-trial motions. Mayfield and White filed their post-trial motions before this deadline, but Ward filed his motion on August 25, 2010. Ward's attorney filed an affidavit stating that the delay was caused by an internet service interruption and was unintentional. This Court accepts Ward's late filing. The Government filed a consolidated response to all three post-trial motions, and requested permission to file a brief exceeding fifteen pages. This request is granted.

The post-trial motions contain arguments that are common to all three defendants as well as some that are unique for each defendant. All three defendants argue that there was insufficient evidence that they joined a conspiracy and that the conspiracy involved the distribution of the drug proceeds. White separately argues that he should be acquitted of the attempt charge because he never took a substantial step toward the commission of the crime.

Mayfield and Ward separately argue that the Court erred in its rulings on a number of pre-trial motions.

### B.  Evidence at Trial

#### *1.  Testimony and Recordings of Gomez*

Agent Gomez ("Gomez") testified that he operated undercover and posed as a disgruntled drug courier in this case.  His role in the case began when a confidential informant introduced him to Mayfield in a meeting on July 23, 2009.  The meeting took place in Gomez's undercover vehicle:  an SUV wired to record the meeting.  During this first meeting, Gomez explained to Mayfield that he transported cocaine from a stash house once a month but was unhappy with the compensation he received.  He told Mayfield that the stash house usually had 25-35 kilograms of cocaine in it when he arrived, and this was usually guarded by three people with guns.  He explained that he needed a crew to help him rob the stash house, and was told that Mayfield might be able to provide such a crew.  After some further discussion on the details of the stash house, Mayfield agreed to bring a crew to meet with Gomez and plan the robbery.  In addition to Gomez's testimony, the jury also watched the audio and video from a concealed camera in the SUV.  The jury was given a transcript of this audio to assist them in following the conversations in the recording.

On August 9, 2009, Mayfield, Kindle, Ward, and an individual known only as "New York" (who was not a defendant in this case) met

with Gomez in the undercover SUV.  Gomez testified that Mayfield and Ward were present for the duration of this meeting, were within arm's reach at all times, paid attention to what was being said, and participated in the conversation.

At the beginning of this meeting, Gomez repeated that he was a disgruntled drug courier looking for a crew to help him rob a stash house of 25-35 kilograms of cocaine.  He explained that he received a phone call the day before a pickup letting him know to be ready the next day and another phone call twenty minutes before the pickup informing him of the location of the stash house.

Mayfield, Kindle, Ward, and New York then planned the robbery and asked Gomez detailed questions about the stash house.  Gomez told them that he wanted to split the proceeds of the robbery so that each person would get one fifth of the total cocaine stolen. Gomez answered questions regarding the number of guards in the house, whether the guards carried firearms, how long Gomez was usually in the stash house, and how Gomez would contact them when the drugs arrived at the stash house.  New York explained that they would shoot the guard in charge first, they would be carrying silencers, and that they wanted Gomez to be ready to go into hiding if the robbery went badly.  At one point, Gomez said "So if you guys said to me right now, hey, listen, this is way too much for you to handle -- for you guys to handle, let me know now."  In response to this, Gomez testified that Kindle "shook his head no." Mayfield also shook his head no, while New York said no and Ward

explained that it wasn't too much to handle, but that they wanted to get as much information as possible to ensure they were not walking into the situation blindly. At the end of this meeting, Gomez told the crew that as soon as he received the call from the stash house to be ready the next day, he would call Mayfield who in turn would call Kindle, Ward, and New York. The jury listened to an audio recording of the August 9, 2009 meeting and had a transcript to aid in following the conversation.

On the evening of August 9, 2009, after the crew left, Gomez called Mayfield, told him that the stash house had called and that the robbery was on for the next day, and told him to meet the next day in a particular parking lot. On August 10, 2009, Mayfield arrived in the parking lot in a brown van driven by Ward, with Kindle in the passenger seat. Mayfield got out of the van and into Gomez's SUV. Gomez then drove out of the parking lot and led the van to a storage facility. At the storage facility, everyone got out of their vehicles and met in a semicircle. Gomez discovered at this time that New York was absent, and in his place was White. Gomez then asked White if he knew why they were there, what they were going to do, and whether he was ready to do it. White responded in the affirmative. Gomez then told the group that if there were any hesitations about the crime, now was the time to bring them up. Ward said that they didn't come all the way from Milwaukee for nothing. Gomez then asked Kindle if he was good, to which Kindle replied "yes." At this point, Gomez gave the arrest

signal and Mayfield, Kindle, Ward, and White were arrested. The jury listened to an audio recording of the August 10, 2009 meeting and had a transcript to aid in following the conversation.

### 2. *Testimony of Heiserman, Rotunno, Stemmet, and Baumgartner*

Agent Heiserman ("Heiserman") testified about his search of the brown van that Mayfield, Ward, and White used. Heiserman found a mask, a shotgun wrapped in a towel, and three bags in the van, among other things. Inside of these bags, Heiserman found a .44 caliber Ruger revolver, a Glock 22 semiautomatic pistol, two masks, two bulletproof vests, and latex gloves.

Agent Rotunno ("Rotunno") testified that he searched White after the arrest and found a mask in White's pocket. Immediately after the search, White told Rotunno that he (White) was lucky the officers did not catch him with the work. Rotunno testified that he understood "work" to mean narcotics such as heroin or cocaine.

Officer Stemmet ("Stemmet") testified that he recovered a .357 magnum handgun from the rear cargo area of Gomez's vehicle the day after the arrest. No one noticed the gun at the time of the arrest, but Gomez testified that when he later reviewed the video recording from the SUV, he can see that Mayfield threw the gun into the cargo area when Gomez was not looking. After Gomez's testimony about the video, the jury watched the video themselves.

Agent Baumgartner ("Baumgartner") testified to his knowledge of illegal narcotics, including his training and experience from

multiple investigations and informant interviews. Baumgartner testified that a kilogram of cocaine had a Chicago market price of between $25,000 and $29,000 in August 2009. Baumgartner also testified that a kilogram or more of cocaine is consistent with distribution by a drug dealer and not consumption by a drug user. This is based on the limited amount of cocaine one user can consume, as a gram of cocaine is considered a dangerous amount to use.

### 3. *Testimony of Mayfield*

Mayfield testified in the case. On direct, Mayfield admitted to his prior felony convictions and discussed how he met the confidential source at his job shortly after moving to Naperville. The confidential source told him that Gomez was looking for a robbery crew and organized a meeting with him. Mayfield testified that he called Kindle, who then called Ward and New York, and the four met with Gomez as described in Gomez's testimony. After this meeting, Mayfield testified that the four agreed that this was a "suicide mission," and decided not to go through with the crime. On August 10, Mayfield said that he deceived White to come to help him put on a show for Gomez in Naperville, and Kindle and Ward came along. Mayfield claimed that the show was necessary to distract Gomez, as the real conspiracy was between Mayfield and the confidential source, and the real purpose was to rob Gomez of his share of the drugs.

## II. **LEGAL STANDARD**

Federal Rule of Criminal Procedure 29 states that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "[A] judgment of acquittal should only be granted if the evidence, looked at in the government's favor, is so scant that the jury could only speculate as to the defendant's guilt, and a reasonably minded jury must have had a reasonable doubt as to the defendant's guilt." *United States v. Howard*, 179 F.3d 539, 542 (7th Cir. 1999). "A defendant's burden in showing the evidence was insufficient to support a conviction is 'nearly insurmountable.' We view the evidence in the light most favorable to the government and will overturn a conviction 'only if the record contains no evidence, regardless of how it is weighed,' from which the jury could have found the defendant was guilty." *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008) (citations omitted).

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."

## III. **ANALYSIS**

Defendants all move for an acquittal based on insufficient evidence that they joined a conspiracy and that its goal was to possess cocaine with the intent to distribute it. These two claims will be addressed first, followed by the argument that there was

insufficient evidence of a substantial step to warrant a conviction for an attempted offense, and ending with the claim that acquittal is necessary due to erroneous pre-trial rulings.

### A. Conspiracy Charge

The jury found Defendants guilty on Count 1, which charged them with a conspiracy to possess with intent to distribute cocaine. Defendants argue that the government failed to prove that they joined the conspiracy and failed to prove that the conspiracy involved the intent to distribute the drugs.

"Conspiracy is agreement to violate some other law." *United States v. Bartlett*, 567 F.3d 901, 905 (7th Cir. 2009). The government must prove that Defendant knew the illegal objective of the conspiracy, and knowingly and intentionally agreed to participate. *Id.* at 810-11. "Though it might seem odd, the fact that the stash house, the drugs--indeed the whole plot--was fake is irrelevant. That the crime agreed upon was in fact impossible to commit is no defense to the crime of conspiracy." *United States v. Corson*, 579 F.3d 804, 810 (7th Cir. 2009).

#### *1. Joining Conspiracy*

Mayfield and Ward argue that the jury was incorrect in finding that they were participants in the drug stash house conspiracy. They both claim that the evidence at trial showed only a conspiracy between Mayfield and the confidential source to rob Agent Gomez. Mayfield and Ward are correct that some evidence at trial supports

their version of the conspiracy, but it was all evidence from Mayfield's testimony. The jury also heard that Mayfield was present at three planning meetings with Gomez, two with Kindle and Ward, and one with White. Mayfield organized the crew and communicated meeting dates, times, and locations. Gomez, at each meeting, told all present that the goal was to rob a drug stash house and he needed the crew to complete the crime. Ward actively participated in these planning meetings. Gomez repeatedly offered Defendants the chance to back out if the crime was too much to handle, but Mayfield and Ward never did. Instead, they showed up with their co-defendants and the equipment needed for a stash house robbery on the day the robbery was to be executed. While Mayfield's testimony painted a different picture of these events, the jury chose not to believe him. There was sufficient evidence for the jury's verdict against Mayfield.

White argues that the jury did not have sufficient evidence to connect him with the conspiracy. White points out that he was only present for one meeting and that many of the planning discussions took place outside of his presence. White's argument falls short because he need not be as well informed as his co-conspirators, but instead must only know the illegal purpose of the conspiracy and knowingly agree to participate.

Upon discovering that White replaced New York in the crew, Gomez took the time to explain the entire situation to White. White knew that the crew was supposed to rob a drug stash house,

the stash house contained 25-35 kilograms of cocaine, the stash house was defended by three armed individuals, and the drug proceeds would be split evenly among five participants. White agreed to participate in this robbery with full knowledge of these details. White traveled from Waukegan to Milwaukee on August 10, with the other members of the crew, with full knowledge of the plan (Gomez reviewed it despite White's statement that he was already fully informed) and Mayfield told Gomez that White "was 100" when he introduced him. The jury also heard that Mayfield and White view each other as brothers, which they could have considered as additional evidence that Mayfield informed White of all the details. White did not back out when Gomez asked him if he was in for the robbery, was carrying a mask at the time of arrest, and stated after his arrest that he was glad he was not caught with the work. When combined, this evidence provides sufficient support for the jury's verdict of guilty as to Count 1 for White.

### *2. Intent to Distribute*

Defendants Ward and White argue that acquittal is necessary for Count 1 because the government failed to prove an intent to distribute beyond a reasonable doubt. Defendants primarily rely on a line of cases in the Seventh Circuit holding that a simple buy-sell relationship is insufficient to maintain a charge of conspiracy to distribute drugs. *United States v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010).

During both the August 9 and August 10 meetings, Gomez told the crew that the stash house contained 25-35 kilograms of cocaine, and that this was to be split five ways. Both Defendants were present on August 10 for these statements, and knew that they would receive five kilograms or more of cocaine out of the robbery. Baumgartner testified that a kilogram of cocaine would be an amount far beyond what a person would have for personal use and instead is consistent with a distributional amount of cocaine. The evidence that everyone was to receive multiple kilograms of cocaine, and the testimony that a kilogram or more is a distributional amount, provided sufficient evidence of an intent to distribute the proceeds of the stash house robbery.

Defendant's reliance on the buyer-seller cases is misplaced. The Seventh Circuit has held that the sale of distributional amounts of drugs, without more, cannot sustain a conspiracy conviction between the buyer and seller. *United States v. Colon*, 549 F.3d 565, 569 (7th Cir. 2008). This legal authority does not demand an acquittal in this case, as the co-defendants were not related to each other by a simple buy-sell relationship. Contrary to the characterization in Defendants' briefs, this was not a crime where Gomez would "reward" the co-conspirators for the robbery in drugs, but instead it was one where the entire crew was going to share in the proceeds evenly. The co-defendants in this case reached a clear agreement to possess drugs which they all had an intent to distribute. The type of agreement in the present case,

as opposed to a simple buy-sell agreement, has been the basis of a guilty verdict for a conspiracy to possess with intent to distribute in a few cases. *E.g.*, *Corson*, 579 F.3d 804; *United States v. Harris*, 570 F.Supp.2d 1030 (N.D. Ill. 2008). There was sufficient evidence to support the jury's verdict on Count 1, both in regards to Defendants joining the conspiracy and the intent to distribute the drug proceeds of the robbery.

### B. Attempt Charge

White moves for an acquittal on the attempt charge because he alleges that the government failed to prove White had taken a substantial step toward completing the offense. "To be guilty of an attempt you must intend the completed crime and take a 'substantial step' toward its completion." *United States v. Gladish*, 536 F.3d 646, 648 (7th Cir. 2008). "A substantial step is something more than mere preparation, but less than the last act necessary before the actual commission of the substantive crime." *United States v. Barnes*, 230 F.3d 311, 315 (7th Cir. 2000). Two general principles guide this consideration: (1) the action must make it reasonably clear that the defendant would have completed the crime if not interrupted and (2) the focus is on the actions already taken and not those left uncompleted. *United States v. Sanchez*, No. 08-2679, 2010 U.S. App. LEXIS 17008, at *16-17 (7th Cir. Aug. 11, 2010).

White suggests that he was minimally involved in the crime and just showing up to the August 10 meeting was insufficient to warrant an attempt conviction. The evidence reveals that White did more than just attend a single meeting. White traveled in a van with Kindle and Ward to Naperville where they picked up Mayfield. White traveled to meet Gomez with this group in a van with a shotgun, three handguns, two bulletproof vests, gloves, and masks. Gomez reviewed the plan with White, which involved the robbery commencing when Gomez received a phone call with the address, which was to occur very shortly. White confirmed that he was still in for the robbery at this time and even had a mask in his pocket at the time of arrest. The jury could find it reasonably clear from this evidence that White intended to and was prepared to commit the crime if he was not arrested. White took nearly every action possible toward completion of the offense, including arriving at a staging area with the crew, fully informed of the details of the crime that was to happen within minutes or hours, and fully equipped for the offense. This evidence of a substantial step toward completion of the offense was sufficient to support the jury's verdict on Count 2.

### C. Pre-Trial Rulings

Mayfield and Ward move for an acquittal based on this Court's pre-trial rulings. Each pre-trial ruling must be addressed separately.

### *1. Entrapment*

Mayfield argues that this Court's ruling baring him from presenting an entrapment defense was improper. Mayfield argues that entrapment is a question for the jury and not properly decided on a motion *in limine*. Defendant is correct that "generally the question of entrapment is one for the jury, rather than for the court." *United States v. Santiago-Godinez*, 12 F.3d 722, 727 (7th Cir. 1993). However, the Seventh Circuit has laid out an exception to this general rule that is highly applicable to this case. If the government moves *in limine* to bar an entrapment defense, and the evidence proffered in response to this motion is insufficient as a matter of law to support the defense, a pretrial ruling precluding the defense may be appropriate. *Id.* To avoid such a pretrial ruling, the defendant must produce "sufficient evidence upon which a rational jury could have inferred that he was entrapped into committing the crime charged." *Id.*

"To raise an entrapment defense, a defendant must make a showing of both elements of that defense: (1) that he was induced by a government actor to commit the crime at issue; and (2) that he was not predisposed to commit that crime." *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010). Mayfield responded to the pretrial motion to bar an entrapment defense by arguing that the burden was on the government to prove predisposition. Mayfield failed to give any evidence on a lack of predisposition. In a very

similar situation, the Seventh Circuit ruled that it is proper for a district court to bar an entrapment defense. *See United States v. Blassingame*, 197 F.3d 271, 279 (7th Cir. 1999).

In addition, upon witnessing the trial and seeing all the evidence related to entrapment in a motion to reconsider, the Court finds that Mayfield did not have sufficient evidence to convince a rational jury that he was not predisposed to this crime. Mayfield had prior convictions for attempted murder, armed robbery, and burglary. The Court also precluded the government from introducing a statement by Mayfield that he had done a stash house robbery before because the statement's prejudicial value substantially outweighed its probative value given that entrapment defense was already barred from trial. Mayfield also engaged in this conspiracy for profit and actively organized a robbery crew. In similar circumstances, the Seventh Circuit has upheld pre-trial entrapment rulings because no rational jury could have found the defendant was entrapped. *See*, *e.g.*, *Hall*, 608 F.3d at 343.

### 2. *Confidential Source as Witness*

Mayfield and Ward argue that this Court's ruling baring the confidential source ("CS") as a witness prevented them from presenting full defenses. Defendants point out that the CS was present for the July 23 meeting, and so he may have "personal observations concerning relevant and material evidence." *United States v. Tanner*, 941 F.2d 574 (7th Cir. 1991). The Court did not

bar the CS from being called. Instead, concerned that the CS would be called only for improper purposes, the Court required Defendants to proffer a legitimate reason for the testimony before the CS could be called. Defendants never proffered any reason in response to this ruling.

Defendants claim prejudice because the CS may have personal observations concerning the July 23 meeting. However, the CS was minimally involved in this meeting and primarily just observed from the back seat of the undercover SUV. Mayfield and Gomez, the other two present for the meeting, both testified to what occurred on July 23 and Defendants had the opportunity to develop any facts regarding the meeting on Gomez's cross examination or when Mayfield testified. Further, the jury witnessed a video and audio recording of the meeting and had a transcript of what was said during this meeting. Even now it is not clear what information the CS could have provided that was not already in the case, or what Defendants could have proffered.

### 3. *Case Agent as Witness*

Mayfield again argues that he was prejudiced because the Court did not permit him to call Agent Mark Anton ("Anton") as a witness. Defendant's argument fails for essentially the same reason as it did for the CS. In light of the Court's ruling barring an entrapment defense, Mayfield had no legitimate basis for calling Anton. Anton was not a witness to any of the events. He could

have only testified on improper subjects, such as the government's motive for the undercover case. Mayfield failed to proffer any legitimate reason for calling Anton.

### *4. Outrageous Government Conduct*

Mayfield and Ward argue that the Court should have dismissed the indictment for "outrageous government conduct" or a violation of due process rights due to the general nature of the undercover operation. The Court denied this pre-trial motion, and again denies it and points out that such a defense is not recognized in this circuit. *See United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995).

### *5. Suppression of Audiotapes*

Mayfield and Ward argue that this Court's ruling that the recordings were admissible evidence was flawed because Defendants did not consent to the recording. Defendants cite no authority for this proposition and the argument is no different from the one presented during the pre-trial motion. The use of such evidence is common in undercover cases, and Defendants do not distinguish this case from any other case permitting such evidence. *See*, *e.g.*, *Corson*, 579 F.3d 804; *Sanchez*, 2010 U.S. App. LEXIS 17008.

## D. Miscellaneous

Defendants present a few other arguments which are not easily categorized but can be concisely addressed.

Mayfield and Ward argue that the juror verdict form referenced a "measurable" amount of cocaine, so an acquittal is necessary since no real drugs existed in the case. This argument was addressed directly in *Corson*, 579 F.3d at 810:

> Though it might seem odd, the fact that the stash house, the drugs--indeed the whole plot--was fake is irrelevant. That the crime agreed upon was in fact impossible to commit is no defense to the crime of conspiracy.

White argues that since the verdict on Count 1 and 2 must be overturned, then Count 3 must also be overturned because there is no drug crime to serve as a basis for the firearm offense. Since the motion for acquittal is denied as to Counts 1 and 2 for all the defendants, the verdict on the remaining counts is still proper.

Mayfield objects that the jury was improperly instructed. Mayfield's objection is perfunctory and entirely undeveloped. The argument will not be considered since Mayfield provided the Court with no basis to re-examine its decision. *United States v. Fechete*, No. 06 CR 0923, 2008 WL 4200286 (N.D.Ill., Sept. 10, 2008).

### E. New Trial

Mayfield and Ward also request a new trial. "The decision to grant a new trial under Federal Rule of Criminal Procedure 33 is a matter of discretion for the district court and will be disturbed on appeal only if the district court abused that discretion." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). This discretion is usually applied to grant a new trial when

"substantial rights of the defendant have been jeopardized by errors or omissions during trial." *Id.*

Defendants suggest that a new trial may be appropriate even when acquittal is not, because motions for a new trial permit courts to weigh the evidence and consider the credibility of witnesses. *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). This difference in procedure does not change the outcome in this case. Defendants have not carried their burden in pointing out any substantial right that was jeopardized nor have they demonstrated any inculpatory testimony of questionable credibility. The Motion for a New Trial is denied.

## IV. CONCLUSION

For the reasons stated herein, the Court rules as follows:

1. Defendant Mayfield's Motion for Judgment of Acquittal and Motion for a New Trial is denied.

2. Defendant Ward's Motion for Judgment of Acquittal and Motion for a New Trial is denied.

3. Defendant White's Motion for Judgment of Acquittal is denied.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

**DATE:** 10/05/2010